CERTAIN PIECE OF LAND (UNITED STATES v.). See Case No. 14,767.

CERTAIN QUANTITY OF WHEAT (STRONG v.). See Case No. 13,541.

CERTAIN SLAVES (ALMEIDA v.). See Case No. 255.

---

## Case No. 2,560.

### CERVANTES v. UNITED STATES.

[3 Am. Law Reg. (1855) 745.]

District Court, N. D. California.[1]

MEXICAN GRANTS—VALIDITY — CONDITIONS—LIMITS OF MISSION—WITHIN LITTORAL LEAGUES.

1. A grant by the political chief for the time being of Alta California, was not invalid, though it did not receive the previous approbation of the territorial deputation. The grant conveyed a present and immediate interest, and the neglect to obtain such approbation, if it were the duty of the grantee at all, would have been only the breach of a condition subsequent, by which the title was not forfeited.

2. In the same manner, conditions in such a grant, that the grantee should build and inhabit a house within a certain time, and also obtain judicial possession of the land, are conditions subsequent; and where, in a particular case, after the time limited, the grantee actually took possession of the premises, and had lived on them and cultivated them for three years, when he obtained judicial possession, which he maintained till the time of suit, a period of twelve years, it was held that the title had not been forfeited.

3. It is also no objection to such a grant (made in 1836) that the lands comprehended by it were within the limits of a mission.

[See note at end of case.]

4. It is, finally, no objection to such a grant, that the land was within ten leagues of the sea-coast, and that the approbation of the supreme executive did not appear to have been obtained.

[See note at end of case.]

McALLISTER, Circuit Judge. "The board of commissioners to ascertain and settle the private land claims in the state of California," decided in favor of the validity of the claim of the appellant, from which decision the United States appealed to this court, by whom the decree of the said board of commissioners was reversed, and a decree entered declaring the claim of the present ap-

[1] [Affirmed in U. S. v. Cervantes, 18 How. (59 U. S.) 553.]

pellant to be invalid. [Case No. 14,768.] From this last decision an appeal was taken to the supreme court of the United States, by whom it has been remanded to this tribunal with instructions to permit certain amendments to be made in the pleadings. See Cervantes v. U. S., 16 How. [57 U. S.] 619. It now comes before us for decision on its merits, with the lights which have been shed upon some of the principles embodied in it by the decisions made by the supreme court in the recent cases of Freemont v. U. S. [17 How. (58 U. S.) 542], and U. S. v. Ritchie [Id. 525].

From the evidence in this cause it appears, that the appellant having complied with all the provisions of the Mexican government relating to colonization, obtained a grant from Don Nicolas Gutierrez, dated April 1st, 1836, in these words: "Nicolas Gutierrez, lieutenant colonel of the permanent cavalry, commandant general, inspector and superior political chief ad interim of the territory of Alta California. Whereas, Citizen Cruz Cervantes, a Mexican by birth, has applied, for his own benefit and that of his family, for the parcel of land known by the name of San Joaquin, bounded on the north by San Felipe, on the south by Santa Anna, on the west by the plain of San Juan, and on the east by the hills of the same name; and whereas, all the requirements of the laws and regulations in the matter have been complied with; now, by virtue of the authority in me vested, I have thought proper, by a decree of this day's date, and in the name of the Mexican nation, to grant to him the aforementioned parcel of land, declaring the same to be his property by these letters patent, subject to the approval of the excellent deputation and the following conditions: 1st. He will submit to such conditions as shall be made by the regulations hereafter to be made for the distribution of vacant lands, and that meanwhile neither the grantee nor his heirs shall divide or alienate that which is adjudicated them, nor shall they subject it to rent, entail, bond, mortgage, nor to any incumbrance whatever, even if it should be for charitable purposes, nor convey it into mortmain. 2d. He may fence it without obstructing crossings, roads, and servitudes, putting it to such use and culture as he may deem best, but within one year at farthest he shall build thereon a house and shall inhabit it. 3d. He shall solicit of the respective judge to give him judicial possession by virtue of this patent, by whom the boundaries shall be marked, at the limits of which, besides the landmarks, there shall be set some fruit trees or else wild ones of some usefulness. 4th. The land of which donation is made is of two sitios de ganado mayor (two square leagues) according to the plat annexed to the proceedings. The judge who may give possession will cause it to be measured agreeably to ordinance, leaving the excess, (sobrante) which may result to the nation for its purposes as

may be deemed convenient. 5th. If he shall contravene these conditions he shall lose his right to the land, and it may be denounced by any other person. Wherefore I command, that holding this as a firm and valid title, the same be entered in the corresponding book, and be returned to the interested party for his own security and further ends. Given in Monterey on the 1st of April, 1836. Nicolas Gutierrez. F'co del Castillo Negrete, S'rio."

The parol evidence in the cause shows that Cervantes was living on and cultivating the premises "about two years after the revolution between Governor Chico and Gutierrez." This, then, must have been some time in 1838. Another witness deposes to the appellant's living on the premises in 1846, and "that the house looked to be several years old," and the continued occupation by him and cultivation of the premises down to the present time, is established. The genuineness of the grant and all preceding documents on which it is predicated is not disputed. The objections to the claim are: 1st. That the grant had not received the approval of the territorial deputation. 2d. That a house was not built within the time prescribed by the grant, nor judicial possession applied for. 3d. That the land belonged to a mission, and could not be granted. 4th. That the lands being within ten leagues of the sea coast, were not subject to colonization.

A reference to the first and immediately succeeding articles of the general regulations of 21st November, 1828, for the colonization of Mexican territories, of which Upper California was one, will show the power of granting lands was confined to the political chiefs of those territories. True it is, that by the fifth article, it is declared that the grants made "shall not be definitely valid without the previous approbation of the departmental assembly, to which the respective expedientes shall be referred." If this article treats the grant as void until such consent shall have been obtained, then is the granting power transferred from the political chief to the territorial deputation, for it would be their approval and not his grant, which conveyed an interest in the land. But the article itself does not consider the grant void without such approval, for in case such approval is not obtained by the political chief, it is made his duty by the sixth article, "to report to the supreme government with the record of the case for its resolution." Intermediate the issuing of the grant, and the approval of the departmental assembly, and that if that could not be obtained, the promulgation of the resolution of the supreme government, the grant is declared to be not definitively valid. It is then at least inceptibly valid—but to what extent, as the regulations are silent, we must look to the grant itself, the construction placed upon it by the supreme court of the United States, and the well established usage of the country for an answer. In the case of Fremont v. U. S., 17 How. [58 U. S.] 542, and in that of U. S. v. Ritchie, Id. 525, grants similar to that under consideration were reviewed by the supreme court. That tribunal declared in the former case, that the words of such grant "were positive and plain;" they purport to "convey a present and immediate interest." Now the consent of the territorial delegation could not vary the character of the grant. Passing by its terms, a "present and immediate interest," it presents the ordinary case of an estate or interest conveyed to the grantee determinable on the happening of a future event. The usage of the country also established this interpretation of the grant. One of the witnesses in the case, E. P. Hartnell, deposes, he has resided thirty years in California, has filled the offices of inspector general to the missions, collector of the port of Monterey, translator to the military government of California, and is now state translator; is well acquainted with the usages and customs which prevailed for eleven or twelve years prior to the acquisition of the country by the Americans, in relation to the granting of lands. He states the usage was for the grantee upon receiving the governor's grant, to consider himself entitled to enter into the granted premises, and so far from having to wait for judicial possession or the approval of the deputation, "I have known, (he says,) numerous instances in which neither the one nor the other was asked for many years." He further deposes, "it was always considered the duty of the governor to do that, (to obtain the approval of the assembly,) and I know, from my own knowledge, that whilst the deputation was held at Monterey, the governor always did so. I never knew of any grantee interesting himself about getting the approval of his title, until it was rumored that the Americans were coming to take possession of the country." On his cross-examination he is equally explicit as to the usage and the general opinion of the inhabitants as to its existence. Viewed then, as the grant has been construed by the supreme court, or as it has been interpreted by the well established usage in California, during the Mexican rule, the court considers that the failure of appellant to procure the approval of the departmental assembly, if it is to be deemed his duty so to have done, was the breach of a condition subsequent, for which the title of appellant cannot be forfeited.

The omission of appellant to build a house within the time prescribed by the grant, and to obtain judicial possession of the land, are clearly conditions subsequent. It has been urged, that the eleventh article of the general regulations declares the grant to be "null and void," in case of a failure to occupy and cultivate. But this section applies exclusively to pobladores, (settlers or colonists,) who shall have failed to cultivate the lands on the

terms and with the number of persons or families agreed on. In such cases only, is the grant declared "null and void," and even in such cases the political chief is authorized to confirm the same in proportion to the part of the agreement fulfilled. The conditions then, to build a house within the time prescribed by the grant, and to obtain judicial possession of the premises being conditions subsequent, the breach of both or either of them cannot operate, under the facts of the case, a forfeiture of appellant's title. Arredondo's Case, 6 Pet. [31 U. S.] 729; Fremont v. U. S., 17 How. [58 U. S.] 542.

The third objection to the validity of this claim is, that the lands granted were what are generally termed "Mission lands," and therefore not subject to colonization. This objection we deem to have been disposed of by the supreme court, U. S., in the case of U. S. v. Ritchie, 17 How. [58 U. S.] 525, in which it was decided not to be available.

The last ground taken against the appellant is, that the lands granted to him are situated within ten leagues of the sea shore, and therefore not the subject of grant without the previous approbation of the supreme executive power. "The principle, (say the supreme court,) which prevails as to all public grants of land, or acts of public officers in issuing warrants, &c., is, that the public acts of public officers, purporting to be exercised in an official capacity and by public authority, shall not be presumed to be a usurped, but a legitimate authority previously given, or subsequently ratified, which is equivalent." It is a universal principle, where power or jurisdiction "is delegated to any public officer or tribunal, over a subject matter, and the exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter." Arredondo's Case, 6 Pet. [31 U. S.] 729. In U. S. v. Clarke, 8 Pet. [33 U. S.] 453, the court say, "He who would contravene a grant executed by the lawful authority, with all the solemnities required by law, takes upon himself the burthen of showing that the officer has transcended the powers conferred upon him, or that the transaction is tainted with fraud." The principle under consideration, was extended to a case where a grant was issued by a governor of East Florida, reciting a royal ordinance which authorized the issuing of grants to foreigners, for the consideration therein mentioned; but the grant proceeded to concede lands to a citizen, for a consideration totally different from that mentioned in the ordinance. The court in such case, say, "although the order is recited, it (the grant) does not profess to be founded upon it." This is apparent, (the court say,) from the fact that the land is granted to a citizen, and for a consideration entirely different from that mentioned in the ordinance, and although the ordinance is recited in the grant.

the court proceed to predicate the power to make it upon the decree made by the governor on 3d April preceding. To sustain his power to make such decree and grant, they enter into a general consideration of the Spanish laws, and after enunciating the general principle, "that a grant made by a governor, if authorized to grant lands in his province, is prima facie evidence that his power is not exceeded," they state that the connection between the crown and the governor justifies the presumption that he acts according to his orders. His orders are "known to himself and to those from whom they proceed, but may not be known to the world. Such a grant, under a general power, would be considered as valid, even if the power to disavow it existed, until actually disavowed. It can scarcely be doubted, that in a Spanish tribunal, a grant having all the forms and sanctions required by law, not actually annulled by superior authority, would be received as evidence of title." 8 Pet. [33 U. S.] 451. We do not consider the relative position between the king and a governor, under the Spanish rule, unlike that which existed between the executive and the territorial chief, under the Mexican régime, as to absolutism on the one hand, and dependence on the other. It is upon such presumed relation, the supreme court rests its argument to some extent in the case cited, and sustains the grant. Now the argument against the validity of appellant's grant is, that the lands covered by it are within ten leagues of the sea coast, and without the previous approbation of the supreme executive power of Mexico, could not be granted. The general power to grant is not denied; but it is asserted that these specific lands were excepted from the granting power; and the 4th article of the colonization law of the 18th August, 1824, is relied on. For the present it may be admitted, that such is the clear import of that article, and the first reply to it is, that four years subsequently, in the year 1828, the supreme executive power did give its approbation as required. The act of 1824 did not express the form in which such consent was to be given. That was left to the discretion of the executive.

In 1828 the general regulations for the colonization of the territories of the republic were announced by the supreme executive power. By the first article the power to "grant vacant lands generally within their respective territories," was delegated to the political chief. There is no limitation in terms as to vacant lands, within ten leagues of the sea coast; but there is a reference to a class of lands, a portion of which is well known to lie within the ten littoral leagues, and that reference is to be found in the 17th article, where it is provided that mission lands are not to be colonized, not because of their vicinity to the coast, but because it was yet to be determined by the government whether they

.were to be considered the property of neophytes, catechumens, and of Mexican settlers. It is natural to suppose, that in the settlement of a new country, with a savage foe in the interior, with the ecclesiastical and military establishments on the coast, and a sparse population struggling into existence, that the lands first petitioned for, should be those immediately on the coast, affording safety from hostile attacks in the rear, and in front the means of escape in the hour of necessity. In truth the very object of the law, (the settlement of families and cultivation of the soil,) could only be effected by primarily reclaiming the frontier lands on the coast. Accordingly, the political chiefs—not one, but all—proceeded, to grant vacant lands without distinction. It has been well argued by the board of commissioners in this case, "that one political chief or governor, might have erred in the matter through ignorance, or from some improper motive, and so of one body of the deputation or junta; but that all should have done so through a series of years, and successions of terms, it is difficult to believe; and the evidence of this construction is heightened to the highest degree of moral and legal certainty by the acquiescence of the executive, after we must presume he had knowledge of this construction of his regulations, and never intimating, as far as we can learn, that there was any error in this uniform course of proceeding. His knowledge of all this is a presumption of law, from the requirement of quarterly returns to be made to him of all the grants that were made and the facts relating to them" (9th article, general regulation, 1828). In this case there was no fraud on part of appellant; no mistake on the part of the political chief. The former, in his first petition for a grant, gives the boundaries of the land, and in his second reiterates them, accompanying such petition with a map; and the proper functionary to whom the petition was referred, reported the land to be within the ten littoral leagues mentioned in the law of August 18th, 1824, and the report concludes "that the land may be granted to petitioner if the mission of San Juan Bautista, to whom it belongs has no objection." In face of the fact that the lands proposed to be granted were reported by the appropriate functionary to be within the ten littoral leagues, the governor proceeded to grant them. All other political chiefs before and since his time have exercised like power. All the Mexican functionaries recognized it—the most valuable portions of land were granted under its exercise, and the people of the territories acted upon it. Property conveyed under it passed from one to another by operation of law, and by act of the parties for years—all acted upon the belief of the right of the governors to grant, and of the correctness of the interpretation placed by them on the regulations. The usage and custom was well established,

and the community to a considerable extent was built up under its operation. The supreme court have said "there is another source of law in all governments:—usage, custom, which is always to be presumed to have been adopted with the consent of those who may be affected by it. The court not only may, but are bound to respect general customs and usages as the law of the land equally with the written law, and when clearly proved they will control the general law." "We cannot impute to congress the intention to not only authorize this court, but to require it, to take jurisdiction of such a case, and to hear and determine such a claim according to the principles of justice, by such a solemn mockery of it as would be evinced by excluding from our consideration, usages and customs, which are the law of every government, for no other reason than in referring to the laws and ordinances in the second section, congress had not enumerated all the kinds of laws and ordinances by which we should decide whether the claim would be valid if the province had remained under the dominion of Spain." Arredondo's Case [supra]. This court consider that the exception sought to be established in this case to the general power of granting by the political chiefs, is not clearly made out against the legal presumption which exists in favor of a grant on a fair interpretation of the phraseology of the general regulations of 1828, and the well established usage of the Mexican local authorities, acquiesced in for a series of years by the supreme executive power. Opposed to all these, is a verbal criticism upon two articles of the regulations of 1828, in connection with the 4th article of the colonization act of Mexico, 18th August, 1824. The first act of the regulations, it is argued, authorizes the political chiefs to grant only in conformity to the act of the 18th August, 1824, and the third article directs the political chiefs to ascertain whether the requirements of that act are embraced in the petition, and whether the petitioner, as well as the land, possess the requisite conditions. Now, the act of colonization contained general provisions, which were designed to control the new system Mexico had recently adopted, and doubtless the general regulations of 1828 were intended to carry out the policy of that act. Among other provisions, it extended to all colonists certain guaranties—restricted the quantity of lands to be held by one person, directed certain distinctions to be made in the selection of grantees, and reserved to the government the right to take precautions, in certain cases against foreigners. The reference to that act by the regulations of 1828, may be regarded as simply adopting its general policy. The direction in the third act of the general regulations to the political chiefs to ascertain if the requirements of the law were embraced in the petition, and the persons as well as the land, possessed

the requisite conditions, are but a repetition of the words in the first article, with the aud..onal direction that he should ascertain if the persons who petitioned, if foreigners, applied with a view to settle in the country —if citizens, to live on and cultivate the soil, and that the land petitioned for was "vacant," such being requisite conditions of persons and land coming within the purview of the regulations themselves. But if this interpretation be deemed equivocal, and not a clear exposition of the intention to be gathered from the colonization act of 1824, and the general regulations of 1828, we consider there is such doubt on this point, that it cannot be successfully urged to defeat the claim of the appellant acquired under the interpretation of the granting power by all the political chiefs and lesser functionaries of the Mexican government, acquiesced in for years by the supreme executive power sanctioned by well established usage, and had thus become a rule of property under which large amounts of property have been acquired, held, and transferred during the existence of Mexican rule in California.

It has been strongly argued by counsel for the appellant that the colonization act of 1824 applies exclusively to foreign colonists, and is applicable to the states only, and does not extend to the territories of the republic. In the view taken of this case, it is deemed unnecessary to discuss these questions.

In this case the evidence clearly establishes the fact that at no time did the appellant abandon his claim. Within two years after receiving his grant he took actual possession of the premises, and lived on and cultivated them until 1841, when the Mexican authorities placed him in judical possession, which he maintained until the acquisition of Mexico by that country. It is true he did not attain judicial possession until some five years after the date of his grant, but subsequently in 1841 he did obtain from the authorities such possession and has continued to hold under it to the present time. Under these circumstances, we consider that his claim is to be held valid by the rules prescribed for our guidance in the adjudication of this and similar cases.

It is therefore hereby ordered, adjudged and decreed that the decision and decree of the board of commissioners for the ascertainment and settlement of private land claims in California made in this case be confirmed, and that the claim of the appellant, Cruz Cervantes, be, and the same is hereby confirmed to the extent of two square leagues or sitios de ganado mayor, and for no more; being the same land described in the grant and expediente referred to therein, and of which judicial possession was given to him as appears by the evidence, provided that the said quantity to him granted, and now to him confirmed, be contained within the boundaries called for in said grant, and map to which the grant refers; and, if there be less than two square leagues, or sitios de ganado mayor, within the said bounds then there is confirmed to him the said less quantity.

[NOTE. The United States appealed from the decree of the circuit court to the supreme court, where the decree below was affirmed on the grounds, as appears from the opinion delivered by Mr. Justice Grier, that under the decision in U. S. v. Reading, 18 How. (59 U. S.) 1, the objection that the grant had not been approved by the departmental assembly was untenable, as was likewise the objection that the land was within the 10 littoral leagues,—that restriction applying to foreign colonists, and not to Mexican citizens,—following U. S. v. Arquello, 18 How. (59 U. S.) 539; also, that the tracts appurtenant to missions never vested in the church or any one else by legal title, and that the lands, though formerly occupied by a mission, were not so occupied when the grant was made, the grant having been made with the assent of the mission, which set up no further claim to occupancy; therefore, that the 17th section of the regulations of 1828, forbidding the grant of lands "occupied" by missions for colonization, could have no*application to unoccupied lands not made the subject of colonization. U. S. v. Cervantes, 18 How. (59 U. S.) 553.]